AMBROSE D. HENRY, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5903.   Promulgated October 29, 1927.

1. Debts due the petitioner, a stock broker, arising from over-extended margin accounts, not having been satisfactorily proved to be worthless and charged off within the taxable year 1919, can not be allowed as a deduction in computing net income for that year.

2. Petitioner was one of three partners engaged in the stock brokerage business. In November, 1919, the firm met with financial difficulties and petitioner, in the settlement of the firm's debts, paid not only his pro rata share, but also the share of one other partner. *Held*, when petitioner paid his partner's share of the firm's obligations a debtor-creditor relationship arose between the petitioner and his partner. The ascertainment of the worthlessness of this debt and its charge-off within the year 1919 not having been satisfactorily proved, the debt can not be allowed as a deduction in that year.

*Camden R. McAtee, Esq.*, for the petitioner.
*W. Frank Gibbs, Esq.*, for the respondent.

This proceeding is for the redetermination of a deficiency in income taxes for the year 1919 of $5,450.59. The issues raised by the pleadings are:

1. Whether respondent erred in disallowing the deduction of certain debts alleged by petitioner to have become worthless in 1919, but which were not charged off until March, 1920.

2. Whether petitioner having been compelled to pay the indebtedness of the copartnership upon dissolution without contribution from one of his partners, is entitled to deduct said partner's share of the amount so paid in the year 1919 in the computation of his taxes for that year.

### FINDINGS OF FACT.

Henry Brothers & Co. (hereafter referred to as the firm), was a copartnership organized in 1917 for the purpose of entering into the stock brokerage business in New York City. The New York office was conducted by the petitioner, who was the senior partner, and O. W. Muller, one of the junior partners. The firm also operated a branch office in Newark, N. J., which was conducted by John G. Miller, the other junior partner.

The firm shared in the general prosperity prevailing in the early months of 1919, and it being the custom of the firm to distribute profits monthly, it distributed during the first three months of 1919, 40 per cent to Henry, 10 per cent to Muller and 50 per cent to Miller. On account of the general decline in the stock market and the overextended condition of the firm's margin accounts it had sustained severe financial reverses by November 14, 1919, and was compelled to discontinue business. Petitioner being the financial backer of the firm was, upon discontinuance of business, obliged to meet not only his share of the firm's obligations but also the share which should have been borne by Muller, and for this purpose he borrowed $75,000 on his personal credit. Muller was also personally indebted to the firm because of an overextended margin account carried for him by the firm, and also as guarantor on a customer's account. In his attempt to collect something from Muller, petitioner forced him into bankruptcy in 1923, but was unable to realize anything on his obligations.

At the time of the discontinuance of business the firm was carrying four margin accounts of one George C. Smith, which accounts at the time trading therein was suspended, showed a net aggregate

debit balance greatly in excess of the value of the collateral security held therefor. On November 8 or 9, 1919, petitioner notified Smith that he would have to put up additional margin, or that his accounts would be closed and Smith promised that he would try to protect them, but having failed to do so, Smith was prohibited from further trading after November 17, 1919. The accounts of Smith were marked Nos. 1, 2, O, and B. So much of each of these accounts as are deemed pertinent to the issues herein and reveal the activity therein through the period during which the firm was in liquidation, will be set forth in the order mentioned.

Account No. 1, showing the balance brought forward at December 1, 1919, to the date of closing, March 16, 1920, shows the following entries:

| | | | | | | |
|---|---|---|---|---|---|---|
| Dec. | 1 | Balance | $14,052.12 | Dec. 11 | Coup. Apr. 15/19 --- $950—IV 4¼ | $1,919.00 |
| | | Long:<br>$850 Lib. II 4¼.<br>$2,800 Lib. III 4¼.<br>$950 Lib. IV 4¼.<br>$1,400 Lib. V 4¾. | | | Coup. May 15/19 --- 850—II 4¾<br>Coup. Sept. 15/19 -- 2,800—III 4¼<br>Coup. Nov. 15/19 -- 850—II 4¾<br>Coup. Oct. 15/19 --- 950—IV 4¼ | 1,810.00<br>5,954.00<br>1,804.00<br>2,020.00 |
| | | Interest at 6% to Jan. 1/20. | 72.10 | 31 | Coup. Dec. 15/19 --- 1,400—V 4¾ | 3,798.00 |
| | | Carrying charges | 36.05 | | Balance | 13,987.22 |
| | | | 14,160.27 | | | 14,160.27 |
| 1920<br>Jan. | 1 | Balance | 13,987.22 | Feb. 13 | $950 Lib. 4¼ 90.92 | 876.98 |
| | | Long:<br>$850 Lib. II 4¼.<br>$2,800 Lib. III 4¼.<br>$950 Lib. IV 4¼.<br>$1,400 Lib. V 4¾. | | | $1,400 Victory 4¾ 97.64<br>$2,800 Lib. 3–4¼ 93.40<br>$850 Lib. 2–4¼ 90.62<br>To Diff. on Lib. Bonds | 1,377.67<br>2,646.65<br>779.09<br>17.48 |
| | 30 | Interest at 6% to 2/1 | 72.23 | Mar. 16 | Journal #81 by bad debts charged off. | 8,409.73 |
| | | Carrying charges | 48.15 | | | |
| | | | 14,107.60 | | | 14,107.60 |

Account No. 2, showing the balance brought forward at December 1, 1919, to the date of closing, March 16, 1920, shows the following entries:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dec. | 1 | Balance | $81,307.61 | | | Balance | $81,937.69 |
| | | Long:<br>600 Republic Motors.<br>2 Burns Bros. $50 Burns<br>Scrip. | | | | | |
| | | Interest at 6% to Jan. 1/20 | 420.05 | | | | |
| | | Carrying charges | 210.03 | | | | |
| | | | 81,937.69 | | | | 81,937.69 |
| 1920<br>Jan. | 1 | Balance | 81,937.69 | Feb. | 16 | Div. %2–BB | 5.00 |
| | | Long:<br>600 Rep. Motors.<br>2 Burns.Bros. $50 Burns<br>Scrip. | | | 27 | 2 BB 101⅛ | 202.67 |
| | | | | Mar. | 4 | Del. Dec. 29 | 207.67 |
| | 30 | Int. 6% to 2/1 | 423.30 | | | J. S. Bache a/c The Schatz-<br>kin, 600 Republic at 50. | 30,000.00 |
| | | Carrying chgs | 282.20 | Mar. | 16 | Journal #81 by bad debts<br>charged off. | 52,435.52 |
| | | | 82,643.19 | | | | 82,643.19 |

Account No. O, showing the balance brought at December 1, 1919, to the date of closing, March 16, 1920, shows the following entries:

| Date | Description | Amount | Date | Description | | Amount |
|---|---|---|---|---|---|---|
| Dec. 1 | Balance | $2,031.28 | Dec. 11 | Coup. Apr. 15/19 | $100—IV 4¼ | $2.02 |
| | Long: | | | Coup. May 15/19 | 100— II 4¼ | 2.13 |
| | $100 Lib. II 4¼. | | | Coup. Oct. 15/19 | 100—IV 4¼ | 2.12 |
| | $100 Lib. 4¼. | | | Coup. Nov. 15/19 | 100— II 4¼ | 2.12 |
| | $100 Lib. V 4¾. | | 31 | Coup. Dec. 15/19 | 100— V 4¾ | 2.71 |
| | Interest at 6% to Jan. 1/20 | 10.50 | | Balance | | 2,035.93 |
| | Carrying charges | 5.25 | | | | |
| | | 2,047.03 | | | | 2,047.03 |
| 1920 | | | | | | |
| Jan. 1 | Balance | 2,035.93 | Feb. 13 | $100 Lib. 4-4¼ | 90.92 | 92.31 |
| | Long: | | | $100 Victory 4¾ | 97.64 | 98.41 |
| | $100 Lib. II 4¼. | | | $100 Lib. 2-4¼ | 90.62 | 91.66 |
| | $100 Lib. IV 4¼. | | Mar. 16 | Journal #81, by bad debts charged off. | | 1,771.05 |
| | $100 Lib. V 4¾. | | | | | |
| 31 | Interest at 6% to 2/1 | 10.50 | | | | |
| | Carrying charges | 7.00 | | | | |
| | | 2,053.43 | | | | |

Account No. B, showing the balance brought at December 1, 1919, to date of closing, March 16, 1920, shows the following entries:

| Date | Description | Amount | Date | Description | | Amount |
|---|---|---|---|---|---|---|
| Dec. 1 | Balance | $556.65 | Dec. 11 | Coup. Sept. 15/19 | $50—III 4¼ | $1.06 |
| | Long: | | | Coup. Nov. 15/19 | 100— II 4 | 2.00 |
| | $100 Lib. II 4. | | | Coup. May 15/19 | 100— II 4 | 2.00 |
| | $50 Lib. III 4¼. | | | | | |
| | Interest at 6% to Jan. 1/20 | 2.87 | | Balance | | 555.90 |
| | Carrying charges | 1.44 | | | | |
| | | 560.96 | | | | 560.96 |
| 1920 | | | | | | |
| Jan. 1 | Balance | 555.90 | Feb. 13 | $50 Lib. 3-4¼ | 93.40 | 47.57 |
| | Long: | | | $100 Lib. 2-4 | 90.20 | 91.18 |
| | $100 Lib. II 4. | | Mar. 16 | Journal #81, by bad debts chge. off. | | 421.90 |
| | $50 Lib. III 4¼. | | | | | |
| 31 | Interest at 6% to 2/1 | 2.85 | | | | |
| | Carrying charges | 1.90 | | | | |
| | | 560.65 | | | | 560.65 |

The balances of all the foregoing Smith accounts were properly ruled and the balances brought down at January 1, 1920, and the accounts were duly charged with interest and carrying charges for the month of January. The Liberty bonds held as collateral security in accounts Nos. 1, O, and B, were sold in February, 1920, and a credit made to each of these accounts on February 13, 1920, for the proceeds from the sale thereof. Account No. 2 discloses that it was credited on February 16, and 27, 1920, with a dividend on two shares of Burns Brothers' stock and with the proceeds from the sale of those two shares. That account shows further that on March 4, 1920, a credit entry of $30,000 was made which bore the following description: "Del. Dec. 29 J. S. Bache account of Schatzkin 600 Rep. Motors at $50." The following balances of the four Smith accounts

hereinbefore referred to were charged off by Journal Entry No. 81, March 16, 1920:

| | |
|---|---:|
| No. 1 | $8, 409. 73 |
| No. 2 | 52, 435. 52 |
| No. O | 1, 771. 05 |
| No. B | 421. 90 |
| | 63, 038. 20 |

After the closing of the four Smith accounts, petitioner attempted to collect the balances thereof, but Smith contended that Muller had failed to carry out instructions relative to his accounts and that his failure to do so resulted in the losses complained of. Petitioner did not employ an attorney because he thought it would be a waste of money, but he personally called upon Smith several times, attempting to make collection.

In addition to the permanent books of record, the firm also maintained separate records for the use of the margin clerk, whose duty it was to notify the partners when fluctuations in accounts necessitated additional collateral for customers' accounts. The Smith accounts were suspended in November, 1919, and further trading therein was prohibited because of the failure of Smith to deposit additional collateral.

The partnership's return for 1919 shows a deduction of $96,224.05 for bad debts, which amount did not include the losses sustained through Muller's failure to meet his personal obligations to the firm. Of that amount the respondent allowed $33,185.85 as a deduction, leaving the amount of the four Smith accounts hereinabove referred to of $63,038.20 which was disallowed. Although petitioner attempted to effect an understanding with Muller in 1920, and he later forced him into bankruptcy in 1923, he has not succeeded in collecting anything from him either on account of his personal obligations to the firm or for his share of the firm's losses. At the time of dissolution, no agreement was entered into with Muller with respect to paying the partnership's debts. Petitioner paid the partnership's debts voluntarily from a sense of honor and good judgment.

During the last nine months of 1919, the partners' profit-sharing percentages were 35 per cent to petitioner, 25 per cent to Muller, and 40 per cent to Miller.

The petitioner, by motion at the hearing, amended his petition, whereby he claims to be entitled to deduct not only his pro rata share of the $33,185.85 of the bad debts allowed by the respondent as a deduction, but that he is entitled to deduct in addition thereto the amount which would ordinarily be deductible by Muller, who had failed to bear any portion of that amount.

OPINION.

MORRIS : The first question in issue is whether or not the respondent erred in disallowing as a bad debt deduction in 1919, the aggregate amount of the four Smith accounts hereinabove referred to.   The petitioner contends that they should have been allowed as a deduction ; the respondent on the other hand, contends that the amount of $63,038.20 sought to be deducted, was not ascertained to be worthless and charged off within the meaning of the statute and therefore the deduction should not be allowed.

Section 214 (a) (7) of the Revenue Act of 1918 provides :

(a) That in computing net income there shall be allowed as deductions :

\*       \*       \*       \*       \*       \*       \*

(7) Debts ascertained to be worthless and charged off within the taxable year.

Thus it will be seen that in order to comply with the provisions of section 214 (a) (7) above the petitioner must not only have ascertained these debts to be worthless, but must have charged them off within the taxable year, in order to avail himself of the deduction. Let us examine the testimony and see if these two tests have been satisfactorily met.   The testimony shows that Smith was called upon to deposit additional collateral in November, 1919, and that failing to comply with these demands, trading in his accounts was suspended.   The petitioner testified with respect to his investigation of Smith that "As near as I can find out, he is an automobile salesman ; 1 do not know whether it is a salesman or not,—I would not be certain what it is, but he is traveling here and everywhere out of Detroit now."   The petitioner was asked whether Smith owned the home he lived in in Hackensack in 1919, and he replied : " That I do not know ; I do not know whether he owned his home or not."   He was again asked if he knew where Smith did his banking and the petitioner replied : " No, I think he did it through,—the only thing I know is that everything came through Mr. Schatzkin."   Petitioner did not know whether he had an individual banking account or not. When asked whether Smith owned an automobile, petitioner replied : " I do not know whether he did or not.   I was not intimate with him at all."   It appears from the testimony of the petitioner, that he has never given up hope of collecting from Smith, because as his testimony shows he went to Smith's home several weeks just prior to the hearing with respect to this matter.

It appears to us from this testimony that the petitioner shows very little knowledge of the financial condition of Smith—certainly not a sufficient knowledge for him to appraise the worthlessness of these debts in 1919.   We are of the opinion that the testimony with respect to the worthlessness of this debt in 1919 has not been satisfactorily

established.  However, we need not rely solely upon the question of whether or not these amounts were ascertained to be worthless in 1919.  As will be observed the statute provides two tests which must be complied with.  First, the debt must be ascertained to be worthless and, second, it must have been charged off within the taxable year.  *Greenville Textile Supply Co.*, 1 B. T. A. 152; *Donalsonville Oil Mill*, 1 B. T. A. 167; *Dover Iron Co.*, 1 B. T. A. 1123.  Petitioner contends that the transactions with Smith were closed when the margin clerk closed his accounts, and that therefore, that was sufficient charging off to meet the statutory requirements.  We do not deem that this actually effects a charging off within the meaning of the statute.

The Smith accounts were closed as far as additional trading was concerned in November, 1919, but this action by the firm was to prevent additional losses.  Had Smith subsequent to this alleged closing, deposited additional collateral in compliance with the firm's demands, his account no doubt would have been thrown open for further trading.  As we have shown hereinbefore, the four Smith accounts were carefully ruled at December 31, 1919, and interest charged in December and the balances brought down at that time, and further, that interest was charged in January, 1920.  It seems clear that if the petitioner had regarded these accounts as worthless at any time prior to December 31, 1919, he would have made the actual charge-off within 1919 instead of bringing forward the balances at that date and charging the accounts with interest and carrying charges for the month of January.  Certainly no more bookkeeping effort would have been required to effect a charge-off than was required to bring down these balances and make additional entries.  It is true that the accounts contained collateral securities in the form of Liberty bonds which might have prevented the closing of these accounts, but as the testimony shows, and it is a well known fact, the value of Liberty bonds changes only slightly from month to month, therefore these bonds could have been as easily disposed of in 1919 as in 1920.

The petitioner cites *Appeal of Mason Machine Works*, 3 B. T. A. 745, in which case certain bad debts were charged off on the books *as of* December 31, 1918, after the books had been closed for the year and ruled down.  The facts of that case are clearly different from the facts in the instant case.  It seems that in that case the petitioner charged off a certain debt after its books had been closed and the entry was made as the first entry in 1919 *dated December 31, 1918*.  In that case the Board held that there was a substantial compliance with the requirement that the amount be charged off within the taxable year.  In this case, the actual charge-offs were made on March 16, 1920, and were so dated.  They do not purport to be as of December

31, 1919; furthermore, the balances as actually charged off include interest for January, 1920. If these accounts had been charged off as of December 31, 1919, and included in the business for that year, although the physical act of charge-off was not performed within that year, but within a reasonable time thereafter, there would have been a sufficient compliance with the statute. *Appeal of A. W. Blackie*, 2 B. T. A. 747. But that is not this case.

Considering the clear and unmistakable provisions of the statute, the decided cases thereunder, and the testimony adduced at the hearing, we are of the opinion that there has not been a sufficient compliance with the provisions of section 214 (a) (7) to warrant a conclusion that these debts were ascertained to be worthless and charged off within the taxable year 1919. The findings of the respondent with respect to this issue are affirmed.

The second question raised by the pleadings is whether the petitioner, who has been compelled to pay not only his pro rata share of the partnership's indebtedness upon dissolution, but the pro rata share of his partner, is entitled to deduct his partner's share in the computation of his individual taxes for the year 1919.

In the return of the partnership for the year ended December 31, 1919, a deduction of $96,224.05 was claimed as bad debts of the partnership, which amount consisted of the totals of the Smith accounts hereinabove referred to, the $63,038.20, and the following:

| | |
|---|---:|
| W. C. Cunningham | $15,448.49 |
| J. H. McGovern | 5,978.84 |
| Sam I. Perlman | 934.00 |
| Blaisdel, guaranteed | 3,425.28 |
| Syndicate account | 1,500.00 |
| Newark losses | 5,899.24 |
| | 33,185.85 |

As has been stated hereinbefore, the respondent disallowed the sum of $63,038.20, the amounts of the Smith accounts, because these accounts had not been found to be worthless and charged off within the year 1919, but he did allow, for reasons which we do not know and which are not material to the proper consideration of the issue raised here, the sum of $33,185.85. The Newark losses of $5,899.24 included in the sum allowed by the respondent, having been borne by Miller, the manager of the Newark office, in accordance with the partnership agreement, we must reduce the sum of $33,185.85 by that amount in arriving at the figure which raises the present issue in controversy, or the amount of $27,286.61. Of this latter amount the respondent has allowed the petitioner to deduct 35-55ths in the computation of his individual income for the year 1919, leaving a balance of 25-55ths which would ordinarily be deductible by Muller

as his share of the losses of the New York office. It is well to point out at this juncture that there is some conflict in the record as to whether Muller's percentage was 20 per cent or 25 per cent—the testimony shows 25 per cent. The petitioner contends that he should not only be allowed to deduct 35-55ths of $27,286.61 in the computation of his personal income for the year 1919, but that because of the failure of Muller to bear his portion of this loss, he should be permitted to deduct an additional 25-55ths, or Muller's share.

Because of the indefiniteness of the pleadings we are not certain whether petitioner relies upon subsection 4 or 7 of section 214 of the Revenue Act of 1918; we must, therefore, first determine whether this alleged loss is an ordinary one incurred in the trade or business and therefore deductible under the provisions of subsection 4 of the Act aforesaid or whether it is a debt and governed by the provisions of subsection 7, of that Act.

Section 214 (a) (4) of the Revenue Act of 1918 is as follows:

(a) That in computing net income there shall be allowed as deductions.

    *       *       *       *       *       *       *

(4) Losses sustained during the taxable year, and not compensated for by insurance or otherwise if incurred in trade or business.

The word " loss " has been variously defined to mean " deprivation, etc.," vol. 5 Words and Phrases, 1st Series 4232. Webster's Dictionary defines the word "loss" to be; 1. State or fact of being destroyed; ruin; perdition; as, the loss of a vessel at sea. 2. Act or fact of suffering deprivation; esp., the unintentional parting with something. 3. Act or fact of failing to win or utilize, or the resulting state; as the loss of a race. 4. That which is lost; specif., waste. The word " debt " on the other hand, has been defined to mean " that which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to another, or to perform for his benefit; that of which payment is liable to be exacted; due; obligation; liability." And again it has been defined to include " any sort of obligation to pay money." The word " debt " has been defined to mean " every claim and demand upon which a judgment for a sum of money, or directing the payment of money, could be recovered in an action." Vol. 2 Words and Phrases, 1st Series 1864–66.

A loss and a worthless debt may under certain circumstances amount to the same thing if the debt is charged off within the time prescribed by the statute. *United States ex rel. Ray* v. *Porter*, 19 Fed. (2d) 541.

It is a general rule of law that so long as a partnership continues one partner can not maintain an action *at law* against the firm or against a copartner on account of matter connected with the partner-

ship, and further that this disability continues until there it a settlement of the accounts between the partners although there may have been a dissolution of the partnership, but it has been held that if the equivalent of a judicial accounting has been had or an accounting is rendered useless, a suit may be maintained without it. 20 R. C. L. 925.

It seems clear to us that although no accounting had been rendered between the partners here and that therefore an action at law in *assumpsit* would not ordinarily lie as between the partners for the amount of the existing obligation, such an accounting was utterly useless in this case. At any rate, an accounting was never insisted upon by either of the parties, so far as we are able to determine. Therefore, it appears clear to us that when the petitioner paid the obligations of the firm, the portion which should have been borne by his junior partner became a debt as between them, and was recoverable by an action at law in *assumpsit*. Therefore, finding as we do that this is a debt, it is governed by the provisions of section 214 (a) (7) of the Revenue Act of 1918, *supra*.

Let us therefore determine whether the two tests laid down by the statute have been complied with. It appears from the testimony that after dissolution of the firm, Muller was employed by another brokerage firm as a clerk, with which firm he was employed at the time of the hearing. In 1920 petitioner tried to get an understanding with him but failed to do so. In 1923 petitioner endeavored to collect something from Muller, which resulted in bankruptcy for the latter, but petitioner failed to recover anything. At the time of dissolution it appears that no agreement was made between the petitioner and Muller for the settlement of the firm's debt. It further appears that the petitioner was making an effort to recover from Muller up to 1923, when the latter was forced into bankruptcy. If this debt became worthless in 1919, we are unable to find any satisfactory evidence of that fact in the record. The record is wholly silent with respect to the question of an actual charge off.

Finding that the amount of the firm's obligations paid by the petitioner which should have been borne by Muller created a debtor-creditor relationship between them, and believing as we do that the evidence does not disclose the ascertainment of the worthlessness of this debt, nor the charging off thereof within the taxable year 1919, we are of the opinion that the deduction claimed is not allowable.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

TRUSSELL, GREEN, AND ARUNDELL dissent on the second point.